# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HUDSON INSURANCE COMPANY, et al.    :
    :
    :
    v.    :    Civil No. CCB-13-1505
    :
    :
KRISHNA KUMARI, et al.    :
    :

## MEMORANDUM

This case arises from a contractor's failure to pay its subcontractors or to honor its subsequent promise to settle those disputes.  Hudson Insurance Co. ("Hudson") and Benaka, Inc. ("Benaka") sued Auro, LLC, and its principals, Krishna Kumari and Bharath Kortagere (collectively, "Auro"), for breach of contract, seeking exoneration, specific performance, and indemnity.  Auro subsequently filed counterclaims for accounting, restitution, and indemnification, as well as a third-party complaint seeking contribution from Chickbalpur Manjunath, who owns Benaka, and his spouse, Mamatha Manjunath.  In a previous order, this court granted partial summary judgment for Hudson, Benaka, and the Manjunaths on all claims, except the request for exoneration, which the parties did not press in their motion.  Auro's motion to reconsider that ruling is now pending, alongside Hudson, Benaka, and the Manjunaths' motion for attorney's fees.  For the reasons explained below, Auro's motion to reconsider will be denied and the motion for attorney's fees will be granted.

## BACKGROUND

Kumari and Kortagere are married.  (*See* Mot. Partial Summ. J., Ex. 4, Manjunath Aff. 2, ECF No. 48-7.)  Kumari owned Auro, a small contracting firm, until July 2012, when she

transferred ownership to Kortagere.  (*See* Mot. Partial Summ. J., Exs. 2, 3, ECF Nos. 48-5, 48-6.)

In late 2011, the Maryland Stadium Authority ("MSA") solicited bids to complete two renovation projects for Orioles Park at Camden Yards, which the parties term the "pedestrian bridge project" and "the scoreboard project."  (*See* Mot. Partial Summ. J., Exs. 1A, 1B, ECF Nos. 48-3, 48-4.)  Benaka, another contractor, and Auro entered a "teaming agreement" to facilitate Auro's efforts to win those projects.  (*See* Mot. Partial Summ. J., Ex. 5, ECF No. 48-8.)  On the basis of Benaka's existing relationship with Hudson, that insurance company agreed to issue performance and payment bonds securing Auro's bid for the scoreboard project, but only on the condition that Benaka and its principals, the Manjunaths, agreed to indemnify Hudson for any losses arising from those bonds.  (*See* Manjunath Aff. 4.)  Both Hudson and Benaka conditioned that arrangement on Auro's agreement to deposit payments received from the MSA with a third-party funds control administrator, KORE Financial Services ("Kore"), and to disburse those monies only with Benaka and Auro's approval.  (*See* Manjunath Aff. 5.)  Benaka thus joined Auro, Kumari, and Kortagere in guaranteeing the bonds, and Kumari agreed to deposit funds with Kore.  (*See* Mot. Partial Summ. J., Ex. 7, Indemnity, ECF No. 48-10; Mot. Partial Summ. J., Ex. 11, ECF No. 48-14; Mot. Partial Summ. J., Ex. 9, ECF No. 48-12.)  The MSA awarded both the pedestrian bridge project and the scoreboard project to Auro.  (*See* Mot. Partial Summ. J., Ex. 9, ECF No. 48-12.)  And Kumari, in turn, directed the MSA to deposit payments with Kore.  (*See* Mot. Partial Summ. J., Ex. 9, ECF No. 48-12.)

Because Auro lacked sufficient cash or credit to initiate the projects, it sought financing from Benaka, promising to reimburse that firm upon receipt of progress payments from the MSA.  (*See* Manjunath Aff. 6.)  Benaka agreed, and began paying Auro's subcontractors.  (*See*

Manjunath Aff. 6.)  Notwithstanding Auro's directive to deposit progress payments with Kore, the MSA instead directed progress payments directly into Auro's account.  (*See* Manjunath Aff. 6.)  Initially, Auro transferred those payments to Kore, and both Auro and Benaka subsequently agreed to disburse some of those funds to Benaka as reimbursement for Benaka's payments to Auro's subcontractors.  (*See* Manjunath Aff. 6–7.)

In mid-May 2012, the MSA deposited nearly $143,000 in Auro's bank account.  (*See* Mot. Partial Summ. J., Exs. 13, 14, ECF Nos. 48-16, 48-17.)  On the same day as that deposit, Kumari transferred $142,000 to a personal savings account.  (*See* Mot. Partial Summ. J., Ex. 15, ECF No. 48-18.)  Four days later, she transferred over $145,700 from that personal account to an unidentified money market account.  (*See* Mot. Partial Summ. J., Ex. 15.)  And nine days after that transfer, she withdrew an additional $125,000 from the same account.  (*See* Mot. Partial Summ. J., Ex. 16, ECF No. 48-19.)  The day following that last transaction, a Benaka representative emailed Kortagere concerning the status of the MSA's recent progress payments. "The account has been overdrawn with all the electric payrolls" and other project expenses, Kortagere promptly assured him.  "Will let u [sic] know in a day or two."  (*See* Mot. Partial Summ. J., Ex. 17, ECF No. 48-20.)

Soon, Benaka received communications from various Auro subcontractors, complaining of unpaid bills.  (*See* Manjunath Aff. 8.)  Roughly one week after Kortagere's email to Benaka, Hudson sent Kumari a letter, asserting that Auro's failure to deposit progress payments with Kore constituted a breach of its agreement, in response to which Hudson threatened legal action. (*See* Mot. Partial Summ. J., Ex. 18, ECF No. 48-21.)  Auro neither responded to that letter nor transferred the MSA's progress payments into the Kore account.  (*See* Manjunath Aff. 8.)

Instead, Kortagere executed on Beneka's behalf an allegedly fraudulent purchase order promising to pay one of Auro's subcontractors, the Mosaic Group, for services rendered on the pedestrian bridge project.  (*See* Mot. Partial Summ. J., Ex. 20, ECF No. 48-23; Manjunath Aff. 9–10.)  In doing so, Kortagere capitalized on his one-time position as project manager of a recent Beneka contract in Maryland, which was also for work at Orioles Park.  (*See* Manjunath Aff. 2–3.)  Over a month before executing the allegedly fraudulent contract, however, Kortagere had resigned from his position with Beneka and Mosaic allegedly knew, before executing that contract, that Beneka did no work on the pedestrian bridge project.  (*See* Manjunath Aff. 7; Mot. Partial Summ. J., Ex. 23, ECF No. 26.)

Auro's creditors, meanwhile, came knocking.  In a letter to Auro, the MSA estimated that the firm owed its subcontractors and suppliers over $107,500 on the scoreboard project and over $58,000 on the pedestrian bridge project.  (Mot. Partial Summ. J., Exs. 25, 26, ECF Nos. 28–29.)  And Hudson's agent demanded payment of $193, 286 from Auro as security against anticipated liability associated with its bonds on the scoreboard project.  (*See* Mot. Partial Summ. J., Ex. 24, ECF No. 48-27.)  At the end of July, one of Auro's subcontractors, Pico Industries ("Pico"), sued Hudson under that bond, alleging Auro's failure to pay for completed work.  (*See* Mot. Partial Summ. J., Ex. 27, ECF No. 48-30.)  As Hudson's guarantor, Beneka sought to resolve that claim. (*See* Manjunath Aff. 11.)  Auro and its representatives, however, could not be located, forcing Beneka to retain counsel and engage in discovery to evaluate the magnitude of the subcontractor's asserted claim.  (*See* Manjunath Aff. 11–12.)  Subsequently, Mosaic demanded that Beneka arbitrate a claim for non-payment premised on the allegedly fraudulent purchase order.  (*See* Mot. Partial Summ. J., Exs. 22, 29, ECF Nos. 48-25, 48-32.)

In mid-March 2013, Benaka located Kortagere, who met with Benaka representatives to resolve issues arising from Auro's failure to pay its subcontractors and suppliers. (*See* Manjunath Aff. 12.) At the end of that meeting, those parties entered a written settlement agreement. (*See* Mot. Partial Summ. J., Ex. 30, Settlement, ECF No. 48-33; Manjunath Aff. 12.) Under that agreement, Auro and Kortagere acknowledged that "Benaka did not issue any subcontracts or agreements with any subcontractors on" the scoreboard project or pedestrian bridge project and Auro agreed "to indemnify and save Benaka harmless from any claims that have or may be asserted against Benaka that relate to the above two projects." (Settlement 1.) Auro further agreed to settle disputes related to the scoreboard project and to make certain enumerated payments via Kore to its subcontractors. (*See* Settlement 1–2.) If Auro failed to make those payments within 90 days, then

> AURO and Kort[agere] agree that a judgment may be entered against them in favor of Hudson or Benaka, to the extent of any amounts that they sustain or incur in connection with resolving, defending or paying any claims that have or may be asserted against Hudson or Benaka that relate to the Bridge or Scoreboard Projects, *including but not limited to attorney fees, costs and expenses*.

(Settlement 2 (emphasis added).)

Neither Auro nor Kortagere ever made the payments they had promised. (*See* Manjunath Aff. 13.) Largely on the basis of information obtained via discovery, Hudson settled Pico's claim. (*See* Manjunath Aff. 13–14; Mot. Partial Summ. J., Exs. 31, 33, 34, 36, ECF Nos. 48-34, 48-36, 48-37, 48-39.) It settled the claims of at least two other subcontractors, Arundel Signs, Inc. ("Arundel") and Greencheck Industries/Ward Borland ("Greencheck"). (*See* Manjunath Aff. 13–14.) And it extricated itself from Mosaic's efforts to force Benaka to arbitrate Mosaic's claims. (*See* Manjunath Aff. 12.) Benaka subsequently reimbursed Hudson for those costs. (*See*

*See* Manjunath Aff. 13–14; Mot. Partial Summ. J., Exs. 32, 35, ECF Nos. 48-35, 48-38.)

Hudson and Benaka (collectively, "Benaka") subsequently brought this lawsuit against Auro, Kumari, and Kortagere (collectively, "Auro"), alleging breach of contract and seeking exoneration, specific performance, and indemnity. Auro then filed a counterclaim, demanding an accounting, restitution, and indemnification. And it filed a third-party complaint against the Manjunaths for contribution. As noted, Benaka moved for summary judgment in its favor on all claims and counterclaims, except for its request for exoneration. After Auro failed to respond to that motion, this court granted partial summary judgment to the plaintiffs, but reserved the evaluation of Benaka's demand for attorney's fees. (*See* ECF No. 49.) Auro now moves for reconsideration and Benaka seeks attorney's fees.

## ANALYSIS

### I. Motion to Reconsider

Under Federal Rule of Civil Procedure 59(e), a party may seek relief from an interlocutory order by "show[ing] either (1) an intervening change in the controlling law, (2) new evidence that was not available at trial, or (3) that there has been a clear error of law or a manifest injustice." *Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 407 (4th Cir. 2010).[1] Insofar as Auro makes no arguments relevant to the first or second of these three bases for relief, his motion rises or falls on the third.

Auro first argues that its failure to oppose Benaka's motion derived from its lawyer's

---

[1] Auro does not invoke any particular provision of the Rules of Civil Procedure, although its reference to the factors described in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 395 (1993), suggests reliance on the "excusable neglect" component of Federal Rule of Civil Procedure 60(b)(1). The court need not divine the basis for Auro's motion, however, because "[a] motion to alter or amend filed within 28 days of the judgment is analyzed under Rule 59(e); if the motion is filed later, Rule 60(b) controls." *Knott v. Wedgwood*, Civil No. DKC-13-2486, 2014 WL 4660811, at *2 (D. Md. Sept. 11, 2014) (collecting cases). Auro filed its motion just seven days after the entry of partial summary judgment against it, so Rule 59(e) governs.

misunderstanding of the applicable deadline for the filing of any memorandum in opposition. Although Auro's counsel explains that his misunderstanding arose from discussions at a settlement conference, he does not specify *why* those discussions confused him; he points neither to misleading verbal representations nor to any documentary evidence that might have led him to believe this court's generally applicable rules, *see* Local Rule 105.2(a), did not apply to him and his clients.  If there were any doubts as to their applicability, counsel could have sought clarification from the court.  And, in any case, the CM/ECF entry recording the filing of Benaka's motion correctly specified the applicable deadline for the submission of any opposition.

These circumstances do not suggest that ruling on Benaka's motion without the benefit of Auro's briefing constituted a manifest injustice.  *Robinson*, for example, affirmed the denial of a Rule 59(e) motion premised on the argument that "counsel's computer problems prevented him from presenting his meritorious opposition to" a motion.  599 F.3d at 407.  There, "neither the district court nor [the opposing party] had reason to know about . . . counsel's computer troubles."  *Id.* at 408.  The same is true here, where neither the court nor opposing counsel had any reason to know of  counsel's private confusion, which did not spring from any objective circumstance he has identified.  Courts presume that attorneys understand the applicable rules. *See, e.g.*, *Wells v. Shriners Hosp.*, 109 F.3d 198, 199–200 (4th Cir. 1997).  And a party who has voluntarily selected counsel "cannot later 'avoid the consequences of the acts or omissions of this freely selected agent.'"  *Robinson*, 599 F.3d at 409 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962)).

Auro insists that, had it submitted a timely opposition, its filing would have demonstrated

that the record contained genuine issues of material fact that precluded summary judgment.  But "*before* considering new evidence or arguments that were not presented before judgment . . . the court must *first* determine whether the movant's reasons for not providing such evidence or arguments are justified."  *Id.* at 410 n.9 (citing *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007)).  As noted, Auro has made no such showing.  Even if it had, Auro now points to nothing in the record that would have prevented summary judgment in the first instance.  Auro highlights only a record of Benaka's initial advances to Auro, which subsequently reimbursed Benaka for most of those advances.  In its motion for partial summary judgment, Benaka sought reimbursement for the $1,931.55 balance Auro owed it under that arrangement.  But the vast majority of its claims derive not from Benaka's direct financing of Auro's activity but instead from Auro's subsequent failure to pay its subcontractors and suppliers, who then sought compensation from Hudson and Benaka.  Auro's near-total reimbursement of Benaka's initial advances reveals nothing of Auro's obligations to its subcontractors and suppliers or of its duty to Hudson and Benaka as guarantors of those obligations.  Auro next argues that Benaka mischaracterized some of its advances to Auro.  As Benaka points out, however, it is undisputed that Auro approved release of funds from the Kore account to reimburse Benaka for most of those advances.  (*See* Manjunath Aff. 6–7; Mot. Partial Summ. J., Ex. 12, ECF No. 48-15.)

For these reasons, Auro's motion to reconsider will be denied.

## II.  Attorney's Fees

Benaka premises its claim to attorney's fees and associated costs on the language of its settlement with Auro.[2]  That agreement provided that, if Auro failed to make certain specified

---

[2] Alternatively, Benaka offers a theory of implied indemnification grounded in Auro's "fraudulent and tortious behavior."  (*See* Mot. Attorney's Fees 20, ECF No. 53-1 (citing *Hartford Accident & Indem. Co. v. Scarlett*

payments to its subcontractors and suppliers to settle claims arising from the bridge project and the scoreboard project, it would be obligated to indemnify Hudson or Benaka. As noted, the settlement specified that such indemnification would be equal "to the extent of any amounts that [Hudson or Benaka] sustain or incur *in connection with* resolving, defending or paying any claims that have or may be asserted against Hudson or Benaka that relate to the Bridge or Scoreboard Projects, *including but not limited to attorney fees, costs and expenses*." (Settlement 2 (emphases added).) As Auro acknowledges, "[t]here is no dispute that Defendants Auro and Kortagere executed a document purporting to settle their disputes with Plaintiff, albeit without representation." (*See* Opp. Mot. Attorney's Fees 4, ECF No. 56.) And this court has already determined that Auro breached that agreement by failing to settle its disputes with its subcontractors, as promised. (*See* Order, ECF No. 49.)

Benaka correctly contends that the settlement entitles it to attorney's fees and costs for time its counsel spent resolving this lawsuit, Pico's claims, Mosaic's claims, and Arundel's claims. Those fees and costs were "sustain[ed] or incur[red] in connection with resolving, defending or paying any claims that have . . . be[en] asserted against Hudson or Benaka that relate to the Bridge or Scoreboard Projects." (Settlement 2.) Auro does not argue otherwise.

"[A]ttorney[s'] . . . fees awarded by courts, regardless of their basis, are governed by principles of reasonableness[.]" *Green v. Morgan Props.*, 73 A.3d 478, 492 (N.J. 2013) (second and third alterations in original) (quoting *Walker v. Giuffre*, 35 A.3d 1177, 1179 (N.J. 2012)).[3] Benaka proposes—without any objection from Auro—that the court should evaluate the

---

*Harbor Assocs. Ltd. P'ship*, 674 A.2d 106, 135 (Md. Ct. Spec. App. 1996)). Because the court resolves Benaka's motion on the basis of its express contractual theory, however, it need not evaluate this alternative ground or Auro's objections to it.

[3] Federal courts exercising their diversity jurisdiction apply the choice-of-law rules of the forum state. *See, e.g.*, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). "When determining which law controls the enforceability and construction of a contract, [Maryland courts] apply *lex loci contractus*." *Lewis v. Waletzky*, 31 A.3d 123, 129 n.8 (Md. 2011). Here, the parties formed their agreement in New Jersey.

reasonableness of the fees it seeks via the three-step process applicable to many federal fee-shifting statutes.  (*See* Mot Attorney's Fees 20–21; Opp. Mot. Attorney's Fees 6–7.)[4]  Those steps are as follows:

> First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate.  To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.3d 714, 717–19 (5th Cir. 1974).  Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones.  Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013) (internal quotation marks, citations, and footnote omitted).

### A.  Hourly Rate

Benaka requests fees for time that four attorneys—Cynthia E. Rodgers-Waire, Jason Potter, Paul Evelius, and Kenneth Davies—spent working on these matters, as well as the time of two paralegals—Sharon Phillips and Linda Caballero.  (*See* Mot. Attorney's Fees, Ex. B, Rodgers-Waire Aff. 3–4, ECF No. 53-3.)  "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). Appendix B(3) of the Local Rules of the District of Maryland "provide[s] a presumptively reasonable range of hourly rates" for attorneys and paralegals with certain enumerated years of professional experience, *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 509 (D. Md.

---

[4] Because Auro does not object to applying this standard, the court need not—and does not—evaluate the propriety of doing so.  Notably, in an unpublished decision, the Fourth Circuit required parties enforcing a fee-shifting contract governed by state law to demonstrate reasonableness via this method.  *See Best Med. Int'l, Inc. v. Eckert & Ziegler Nuclitec GmbH*, 565 F. App'x 232, 236–37 (4th Cir. 2014).

2000), which "may be referred to as a guide for determining reasonable hourly rates for state law claims," *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 514 n.8 (D. Md. 2005).

Benaka's lead attorney, Rodgers-Waire, has submitted an affidavit, which Auro does not contest, supporting her client's attorney's fees claim.  In it, she states that she received her J.D. in 1992 and claims an hourly rate of $300.  (*See* Rodgers-Waire Aff. 1, 3.)  She also highlights professional recognition of her achievement in industry publications and frequent speaking engagements.  (*See* Rodgers-Waire Aff. 7.)  Under the local rules, the range of presumptively reasonable rates for attorneys of equivalent experience is between $300 and $475.  *See* Local Rules, Appendix B(3)(e).  Rodgers-Waire's rate is at the very low end of that range and is thus presumptively reasonable.

Benaka requests an hourly rate of $260 for Potter's work on its behalf.  (*See* Rodgers-Waire Aff. 4.)  Like Rodgers-Waire, Potter has been recognized by his peers in professional publications and sometimes presents at professional conferences.  (*See* Rodgers-Waire 7.)  Potter has been a practicing attorney since 2006, (*see* Rodgers-Waire Aff. 7), which entitles him to a presumptively reasonable rate of between $165 and $300 under the local rules, *see* Local Rules, Appendix B(3)(b).  His rate fits squarely within that range, rendering it presumptively reasonable.

Benaka seeks an hourly rate of $300 for the small quantity of work performed on its behalf by Evelius and Davies.  (*See* Rodgers-Waire Aff. 3–4.)  Evelius devoted three-tenths of an hour to Benaka's cause; Davies, two-tenths of an hour.  (*See* Rodgers-Waire Aff. 3–4; Mot. Attorney's Fees, Ex. A, Time Sheets 34, 74, ECF No. 53-2.)  Although Rodgers-Waire's affidavit describes each as a "partner," the court will take judicial notice that Davies was

11

admitted to the Maryland Bar in 1981 and that Evelius followed in 1987.[5]  *See* Fed. R. Evid.

201(b).  The $300 hourly rate they claim is at the very low end of the range prescribed for

attorneys of equivalent experience, rendering it presumptively reasonable.  *See* Local Rules,

Appendix B(3)(e).

Last, Benaka requests an hourly rate of $120 for the work of two paralegals, Phillips and

Caballero, on its behalf.  (*See* Rodgers-Waire Aff. 4.)  This rate is also within the presumptively

reasonable range of between $95 and $150 for paralegals.  *See* Local Rules, Appendix B(3)(f).

### B.  Hours Claimed

Benaka requests an award for 442.6 attorney hours and 5.6 paralegal hours expended to

resolve claims related to the scoreboard and pedestrian bridge projects, which includes

representation related to claims brought by Pico and Mosaic.  (*See* Mot. Attorney's Fees, Ex. B,

Rodgers-Waire Aff. 5, ECF No. 53-3.)  It has submitted detailed time sheets documenting the

services counsel performed on its behalf.  (*See* Mot. Attorney's Fees, Ex. A, ECF No. 53-2.)

Auro, for its part, maintains that the time spent on the Pico and Mosaic claims was unreasonable.

As to Mosaic's claim, Auro fails to specify the nature of its objection, claiming only that

the fee is excessive.  "[T]he court will not review any challenged entry in the bill unless the

challenging party has identified it specifically and given an adequate explanation for the basis of

the challenge."  *Argonaut Ins. Co. v. Wolverine Constr., Inc.*, 976 F. Supp. 2d 646, 657 (D. Md.

2013) (alteration in original) (quoting *Thompson v. U.S. Dep't of Housing & Urban Dev.*, Civil

No. MGJ-95-0309, 2002 WL 31777631, at *10 (D. Md. Nov. 21, 2002)).  The court thus will not

review Auro's objection, which is not grounded in any explanation.

---

[5] Those dates are derived from the Attorney Listing of the Maryland Bar, which is updated weekly on the Bar's website.  *See* Attorney Listing, http://www.courts.state.md.us/cpf/attylist.html (last visited Nov.  21, 2014).

As to Pico, Auro argues that any fees Benaka incurred in evaluating that firm's claim were unnecessary, insofar as it ultimately paid Pico the selfsame sum that Pico initially demanded. As Auro's surety, however, Benaka was obligated to "act in a reasonable manner in handling or paying claims." *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 473 (Md. 2004). Under this standard, Auro "must reasonably expect that compromise and payment will be made *only after a reasonable investigation of the claims*, counterclaims and defenses asserted in the underlying action." *Id.* (emphasis added) (quoting *City of Portland v. George D. Ward & Assocs., Inc.*, 750 P.2d 171, 175 (1988)). Here, the possibility of a pre-settlement investigation conducted by attorneys was expressly described in the indemnity agreement. Benaka's obligation to Pico arose under a contract it formed with Auro and Hudson. That agreement provided that, in the event of default, Auro and Benaka would compensate Hudson for "[a]ll loss, costs and expenses of whatsoever kind of nature, including, but not limited to: court costs and the cost of services rendered by attorneys . . . ." (Indemnity 2.) And the agreement expressly contemplated that Hudson "may incur such expenses, including reasonable attorneys' fees, as well as investigative . . . fees, as it deems necessary or advisable in the investigation, defense and payment of . . . claims" on the bonds it issued on Auro's behalf. (Indemnity 2.)

To evaluate the reasonableness of a surety's settlement, courts examine "(1) the obligations of the surety as provided by the terms and coverage of the bond; (2) whether the principal has made more than generalized demands that the surety deny the claim; (3) the cooperation, or lack thereof, by the principal, in dealing with the surety; [and] (4) the thoroughness of the investigation performed by the surety." *Atl. Contracting*, 844 A.2d at 474

13

(internal citations omitted).  The most salient circumstance of this case is Auro's failure to cooperate with Hudson and Benaka in evaluating Pico's claims.  Indeed, from at least the filing of Pico's complaint in late July 2012, (*see* Mot. Partial Summ. J., Ex. 27), until approximately February 2013, Benaka was unable to locate or communicate at all with Kortagere or any other representative of Auro, (*see* Manjunath Aff. 11–12).  Without Auro's input or access to its records, Benaka was forced to evaluate the magnitude of Pico's unpaid bills via formal discovery.  (*See* Manjunath Aff. 11–13.)  Under the circumstances, Benaka's conduct was reasonable.  And attorney's fees incurred in pursuing that course of conduct were equally reasonable.

Auro next argues that Benaka's short-lived defense of the claim asserted by Pico cannot be characterized as a "success," for the purpose of the three-step fee-shifting test the parties agree applies here, *see, e.g.*, *McAfee*, 738 F.3d at 88, given that Benaka ultimately settled by paying the entirety of Pico's initial demand.  Not so.  The three-step fee-shifting test the parties have invoked fits awkwardly with third-party litigation of this sort.  That test typically applies only where one party prevails over another, *see, e.g.*, *id.* at 87–88, not where one party is contractually obligated to cover third-party litigation expenses.  It is useful only insofar as it evaluates the reasonableness of the attorney's fees demanded.  Here, the court cannot hold that Benaka's fees are unreasonable insofar as Benaka was unsuccessful in its pursuit of discovery with Pico.  As noted, Benaka's litigation strategy was reasonable given its inability to communicate with Auro or any of its representatives.  The hours its attorneys spent working on the Pico litigation are thus compensable, notwithstanding Benaka's ultimate decision to settle Pico's claim.

Last, the court is satisfied that the hours Benaka's counsel expended on its behalf are not unreasonable under the factors described in *Johnson*, 488 F.3d at, 717–19.  The Fourth Circuit has summarized those factors as:

> (1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirablility of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationships between attorney and client; and (12) attorneys' fees awards in similar cases.

*McAfee*, 738 F.3d at 88 n.5 (quoting *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)).   The Fourth Circuit has indicated that the *Johnson* factors may properly be used to inform and sometimes adjust the calculation of the lodestar number.  *See McAfee*, 738 F.3d at 89. Thus, the court considers the *Johnson* factors "in conjunction with the lodestar methodology" and, "to the extent that any of these factors already has been incorporated into the lodestar analysis, [it does] not consider that factor a second time."  *E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs*, 724 F.3d 561, 570 & n.5 (4th Cir. 2013).  Here, the court has considered most of the *Johnson* factors in determining reasonable attorney's fees and Auro does not argue that any of them justify a fee reduction in the proposed award.  Accordingly, the court finds the hours expended in this matter reasonable.

In total, then, the court will award Benaka $76,950 for the 256.5 hours Rodgers-Waire worked on its behalf, $48,256 for Potter's 185.6 hours, $672 for Phillips' and Caballero's 5.6 hours, $90 for Evelius' three-tenths of an hour, and $60 for Davies' two-tenths of an hour.  The total award for attorney's fees, therefore, will be $126,028.

**III. Costs**

Benaka also seeks $982.28 in costs.  As noted, its settlement with Auro entitled it to "costs and expenses," as well as attorney's fees, in the event of a breach.  (Settlement 2.)  Auro does not oppose that request, which will thus be granted.

**CONCLUSION**

For the reasons stated above, Auro's motion for reconsideration will be denied and Benaka's motion for attorney's fees and related costs will be granted.  The court will award attorney's fees in the amount of $125,953 and costs in the amount of $982.28.[6]

A separate order follows.


<u>November 21, 2014</u>                                      <u>            /s/                        </u>
Date                                                        Catherine C. Blake
                                                            United States District Judge

---

[6] Benaka's motion to show cause why Kortagere should not be held in contempt for failing to execute the mortgage mandated by this court's previous order, (ECF No. 58), remains outstanding.  After the filing of that motion, Kortagere executed a mortgage that was unacceptable to Benaka.  (*See* Reply 2, ECF No. 60.)  Appended to Benaka's reply memorandum, however, was an email from Kortagere's counsel, indicating that the previously executed mortgage was in error and that Kortagere would soon execute a version of the mortgage acceptable to Benaka.  (*See* Reply, Ex. B, ECF No. 60-2.)

By December 3, 2014, counsel should file a status report addressing their dispute over the mortgage.  If Kortagere has executed a corrected version of the mortgage, as his counsel's email indicated, then counsel should append a copy of that mortgage to the status report.  In addition, that status report should address what further proceedings, if any, are necessary to close this case.